UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

DONALD A. ADDUCI,     :

   Plaintiff,      :

            :

v.           :  No. 3:13cv1930 (DJS)

            :

YANKEE GAS SERVICES CO.,   :

   Defendant.     :

## MEMORANDUM OF DECISION AND ORDER

This is an action for monetary damages, attorney's fees and equitable relief arising out of a claim of wrongful termination and failure to accommodate in violation of the Americans with Disabilities Act ("ADA"), Title 42 U.S.C. 12101 *et seq.* and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen.Stat. § 46a-60(a)(1). The defendant, Yankee Gas Services Company ("Yankee Gas"), has filed a motion seeking summary judgment against the plaintiff, Donald A. Adduci ("Adduci") pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  For the reasons stated below, Yankee Gas's motion for summary judgment (doc. # 36) is denied.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Parties asserting that a fact is undisputed must support that assertion by "citing to particular parts of materials in the record. . . ." Fed. R. Civ. P. 56(c)(1)(A).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986).  A "material fact" is one whose resolution might affect the ultimate determination of the case.  *Id.* at 248.  A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When determining whether summary judgment is appropriate, the court resolves all ambiguities and draws all inferences against the moving party. *Skubel v. Fuoroli*, 113 F.3d 330, 334 (2d Cir. 1997). Properly supported allegations of the non-moving party will be taken as true. *See Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004). The moving party has the burden "to demonstrate the absence of any material factual issue genuinely in dispute." *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975). "[S]ummary judgement is a drastic device because of its prophylactic function, when exercised, cuts off a party's right to present his case to the jury.  Yet, if the case is totally devoid of an issue of fact there is no reason why the curtain should rise on the trial." *Donnelly v. Guion*, 467 F.2d 290, 291 (2d Cir. 1972).

## II. <u>FACTS</u>

On October 30, 1990, Adduci submitted an application for employment with Yankee Gas. This application included the following statement in the "Applicant's Signature" block: "This application has been completed truthfully and without evasion or omission on my part. . . . I understand that any false statements or omissions are sufficient cause for rejection of this application or dismissal after employment." (Doc. # 36-3, at 7). Adduci's application incorrectly stated that he had been employed by Kentucky Fried Chicken from "1-85" to "12-85." (*Id.*). Adduci failed to disclose in his application that he had been in the United States Navy from February 1985 until October 1985, at which time he had received an "other than honorable" discharge for the stated reason of "misconduct-commission of a serious offense." (*Id.* at 9).

Yankee Gas hired Adduci as a Gas Distribution Mechanic. In January 2005, Yankee Gas promoted Adduci to the position of Field Supervisor – Operations. The job description for the position of "Field Supervisor - Operations" specifies that the position is "a safety sensitive position and subject to random drug testing." (Doc. # 52-1, at 9). Adduci acknowledged at his deposition that this supervisory position was "a safety sensitive job." (Doc. # 36-8, at 16, p. 55:3).

On November 30, 2011, Adduci had a verbal altercation with Richard Witte, a Yankee Gas coworker. In an incident that occurred the next day, December 1, 2011, Aducci swore at his supervisor, Michael Fortier, then stated in a raised voice that "[n]obody around here knows what they're doing," and refused to go into Fortier's office to meet with him. (Doc. # 36-4, at 3, ¶¶ 7-

8). Following the December 1, 20111 incident, Adduci was out of work on a medical leave for over six months due to his mental health issues and two work-related surgeries.[1]

On December 12, 2011, Adduci was involuntarily committed to Middlesex Hospital. Middlesex transferred Adduci to the psychiatric unit at St. Vincent's Medical Center the following day. On December 28, 2011, Adduci attended an intake evaluation at Rushford Center in Meriden, CT ("Rushford") and subsequently began "intensive outpatient treatment" at that facility. (Doc. #36-3, at 11).  On January 16, 2012, Rushford sent a letter addressed "To Whom it may concern" stating that "Donald Adduci is currently unable to perform adequately in the workplace due to the significance of his current psychiatric symptoms." (*Id.* at 12). In a similar letter dated March 22, 2012, Rushford clinician Carol Carlino ("Carlino") "recommended that Mr. Adduci remain completely out of work until on or about 4/20/13 [sic]." (*Id.* at 13). On April 23, 2012, Carlino "recommended that Mr. Adduci continue to participate in ongoing mental health treatment for stabilization of mood and medication management . . . [and] that he remain completely out of work until on or about 05/21/12." (*Id.* at 14).  On June 1, 2012, Carlino recommended "that Mr. Adduci be allowed to return to work on 06/04/12 on a part-time basis, no more than four (4) hours daily, initially for two (2) weeks. After two weeks, he will be re-assessed to determine if the part-time status should continue." (*Id.* at 17).

Dr. Leo Millette, the defendant's occupational physician, examined Adduci on June 4, 2012, and, at that time, thought Adduci was stable and ready to return to work. Prior to clearing

---

[1]Adduci underwent right elbow ulnar nerve transposition surgery on March 26, 2012, and carpal tunnel surgery on May 14, 2012.

Adduci to return to work, however, Dr. Millette wrote a letter to Monique Allgood, APRN[2]

("Allgood"), who had been identified by Adduci as the Rushford medical provider prescribing

his medications. Dr. Millette's letter, dated June 18, 2012, included the following:

> Mr. Adduci works for Yankee Gas and so he does what is
> considered safety sensitive work. In this setting the worst case
> scenario that could occur if an employee makes an error in
> judgment is the possibility of a catastrophic explosion in a
> building. Because of the safety sensitive nature of the work of
> our Yankee Gas employees we must be assured that our
> employees are mentally fit at all time to do this type of work. The
> company has asked me to provide them with a high level of
> assurance that Mr. Adduci is capable of doing this type of work
> currently and in the foreseeable future. . . .
> In summary I am asking you to give your professional opinion on
> two issues regarding Mr. Adduci's employment. First do you
> believe that he can do safety sensitive type work currently and
> in the foreseeable future? Second do you believe that he can
> continue to work as a supervisor of field operation?

(Doc. # 42-20, at 2). In a subsequent telephone conversation, Allgood told Dr. Millette that "she

felt he [Adduci] was safe to return to safety sensitive work." (Doc. # 42-27, at 7, p. 43:2-3).

By way of a letter dated June 29, 2012, Yankee Gas notified Adduci that he was being

suspended without pay for a period of two weeks (Monday, July 2, 2012 through Friday, July 13,

2012) due to his "insubordinate and inappropriate behavior [on November 30, 2011, and

December 1, 2011]." (Doc. # 36-6, at 10). Adduci returned to work on July 16, 2012, at which

time he was reassigned from the Meriden location where he had previously worked to the

---

[2]Under Connecticut law, an advanced practice registered nurse (APRN) has prescriptive
authority. Conn. Gen. Stat. § 20-87a(b).

Waterbury work center. From July 16, 2012 until July 27, 2012, Adduci was assigned to work in Waterbury as a Field Supervisor - Operations on a part-time (four hours per day) basis. At his deposition, Adduci testified that when he asked why he had been reassigned to Waterbury, he was told by Walter Klimczak ("Klimczak"), the Waterbury area manager, that: "Management just told me to take you here and that is all I know." (Doc. # 36-8, at 24, p. 86:6-8). Adduci testified further that he was not told how long he was expected to remain in Waterbury and that while he was at that location, "I didn't have no [sic] work. They didn't give me anything to do. . . . I didn't work there really. I worked four hours a day just sitting in an office." (*Id.* at 24, p. 87:5-6, 12-14).

After July 27, 2012, Adduci took a one-week vacation. On the day he returned to work, Adduci asked Klimczak when he would be returned to the Meriden work center. Klimczak told Adduci that he was permanently assigned to Waterbury and would not be returning to Meriden. At that point Adduci left work and did not return. The medical providers at Rushford who treated Adduci concluded that the stress of trying to return to work caused a relapse, sending Adduci back into the facility's Intensive Outpatient Program, a specialized unit at Rushford for severe cases. After Adduci's relapse, Yankee Gas received letters from Rushford in August and September 2012 stating that Adduci was "currently experienc[ing] psychiatric symptoms severe enough to prevent him from functioning in the workplace." (Doc. # 36-3, at 19, 20).

In a letter dated October 25, 2012, Carlino stated that Adduci was attending regular therapy and medication management sessions and was compliant with his prescribed medication. She then "recommend[ed] that he return to work on 10/29/12, while he continues treatment at

Rushford." (*Id.* at 22). Dr. Millette responded to Carlino in a letter dated October 31, 2012. His letter included the following:

> I am the Northeast Utilities[3] medical director and I am responsible for clearing Mr. Adduci to return to work. I met with Mr. Adduci within the past week . . . . Mr. Adduci reports that his condition [bipolar illness] is currently being well controlled with his medications and psychotherapy and that he is ready to return to the safety sensitive type of work that he had previously been doing. . . .
> I am somewhat familiar with bipolar disorders as I have seen many employees over the years with this condition. In my professional experience some of these employees do well if they are compliant with treatment but typically have multiple relapses over time . . . .
> My approach of determining if an employee is mentally competent to do safety sensitive work is to first have the employee's medical providers clear them to do safety sensitive work.
> In summary I am asking you to give your professional opinion on two issues regarding Mr. Adduci[]. First do you believe that he could do or should do safety sensitive type work currently and in the foreseeable future? Second do you believe that he can continue to work as a supervisor of individuals doing safety sensitive type work? . . .
>
> Your timely response to this request is greatly appreciated since Mr. Adduci will not be cleared to return to work until I get your response.

(*Id.* at 24). Dr. Millette sent a nearly identical letter to Marie Sweeney ("Sweeney"), an APRN at Rushford, asking the same questions.

Sweeney responded to Dr. Millette's letters on behalf of Rushford. Her letter, dated November 7, 2012, included the following statements:

> In regard to Mr. Adduci's ability to do safety-sensitive type work

---

[3]Yankee Gas was part of the Northeast Utilities system, now known as Eversource Energy.

> now or in the future, I do not believe that it is possible to make a
> prediction about his behavior or abilities.
> Mr. Adduci and I have discussed his supervising individuals who
> do safety-sensitive type work. He has informed me that his goal is
> to reduce his stress level by returning to "work in the field" rather
> than work in a supervisory capacity.
> Given your concerns, might there be an accomodation made for
> Mr. Adduci so that he could continue with his employment at
> Northeast Utilities in view of his diagnosis of Bipolar
> Disorder.

(*Id.* at 29).

On November 30, 2012, Yankee Gas sent a letter to Adduci stating the following:

> As you are aware, you are not able to perform the essential
> functions of your present classification of Supervisor-Field Operations.
> Steps have been taken to determine your qualifications for other
> jobs in the system and to identify appropriate vacancies for which
> you could be considered. To date, however, efforts on your
> behalf have not resulted in a job placement; therefore, you are
> hereby notified that your employment with Yankee Gas will be
> terminated in approximately 90 days, on Feb. 28, 20113 unless
> you secure another position within the NU System before the
> 90-day period has elapsed.
> You are urged to work with Nancy Monde . . . who will assist
> you in pursuing any posted job vacancies for which you
> feel you are qualified.

(Doc. # 36-5, at 6).

Adduci testified at his deposition that when he called Nancy Monde about other possible

jobs within the company, "she said there are no jobs. I said, 'So there are not jobs that I could

have at Yankee Gas?' She said, 'You are exactly correct.'" (Doc. # 36-8, at 32, p. 118:5-8).

Sometime after November 30, 2012, Adduci applied online for the positions of stock handler and

distribution mechanic within Yankee Gas. Both positions required a CDL [Commercial Driver's

License]. According to Adduci, he had a CDL at that time, but did not have a "medical card"[4] to go along with the CDL. He testified that he simply would have needed to "go up to the company doctor" in order to get a medical card, which was a necessary accompaniment to a CDL. (*Id.* at 34, p. 129:6-7). He later testified that, to the best of his recollection, the practice at Yankee Gas as to positions that required a CDL was as follows: "They all in the future would require them. If I remember correctly it would be preferred but you didn't need to. You would be able to obtain one." (*Id.* at 38, p. 144:8-10). Adduci was advised that he was not qualified for either of those two positions.[5] Yankee Gas terminated Adduci's employment on February 28, 2013.

## III. <u>DISCUSSION</u>

### A. Adverse Employment Action Due to Disability

Adduci alleges that his employment as a Yankee Gas Field Supervisor – Operations was terminated because of his disability, i.e., his bipolar condition, in violation of the ADA and CFEPA. Yankee Gas maintains that Adduci was terminated as a Field Supervisor-Operations because it determined that he was not qualified to return to work in that position.

---

[4]At an earlier point in his deposition, Adduci testified that getting a medical card involved "get[ting] checked by a doctor [to] make sure I am okay to drive." (Doc. # 36-8, at 17, p. 60:19-22). Although Adduci held a valid CDL when he first became a Yankee Gas supervisor, at some point "the company stopped giving us medical cards," "because we weren't drivers all the time." (*Id*. at 17, p. 61:16-22).

[5]Adduci also submitted applications for two other positions. He withdrew has application for one of the positions (field technician in Shelton, Connecticut) and acknowledged at his deposition that he was not qualified for the other position (test assistant position) because he did not have the required collge degree.

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees . . .  and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff alleging employment discrimination under the ADA or CFEPA bears the burden of establishing the four prongs of a prima facie case including: (1) the employer is subject to the ADA; (2) the employee suffers from a disability within the meaning of the ADA; (3) the employee could perform the essential functions of his job with or without reasonable accommodation; and (4) the employee suffered an adverse employment action because of his disability. *Cameron v. Community Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003); *see Lyte v. South Central Connecticut Regional Water Authority*, 482 F. Supp. 2d 252, 271 (D. Conn. 2007) ("Disability discrimination claims brought under the CFEPA are construed similarly to those brought under the Americans with Disability Act").

Yankee Gas does not dispute that it is subject to the ADA or that Adduci was disabled within the meaning of the ADA. There is also no dispute that Adduci suffered an adverse employment action directly related to his bipolar condition. What is in dispute, and what both parties focus on in their briefs, is whether Adduci could perform the essential functions of his job.

Yankee Gas stresses the fact that Adduci's position of Field Supervisor-Operations was considered a safety-sensitive position. In communicating with Rushford staff, Dr. Millette addressed the safety-sensitive nature of Adduci's job in very direct terms: "In this setting the worst case scenario that could occur if an employee makes an error in judgment is the possibility

of a catastrophic explosion in a building." (Doc. # 42-20, at 2).  Adduci acknowledged at his deposition that his supervisory position at Yankee Gas was "a safety sensitive job." (Doc. # 36-8, at 16, p. 55:3).

Yankee Gas contends that performing and supervising safety-sensitive work was an essential function of Adduci's job of Field Supervisor-Operations. "A court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998). On the basis of the record before it, the Court agrees with the defendant that being able to perform and supervise safety-sensitive work was an essential function of the job of Yankee Gas Field Supervisor-Operations.  The question, then, is whether Adduci was capable of performing that essential function of his job.

This issue is similar to one that was before the court in *Nelson v. City of New York*, 11 Civ. 2732 (JPO), 2013 U.S. Dist. LEXIS 117742 (S.D.N.Y. Aug. 19, 2013). The parties in that action agreed that being able to tolerate the stress of police work was an essential element of the police officer job in question, but disagreed as to whether the plaintiff, on the basis of a mental impairment, was capable of handling the stress of that job. The *Nelson* court recognized that "the question whether Plaintiff can perform the essential function of her job blends into the related question whether she is a 'direct threat' to herself or others." *Id*. at *28. The court then proceeded to consider which party should bear the burden under these circumstances:

> In cases where the essential function and direct threat analyses are
> inextricably intertwined, some courts have placed the burden of
> both inquiries on the plaintiff, while other courts have placed the

-11-

> combined burden on the defendant. The Second Circuit does not
> appear to have spoken directly on this issue; it has held, however,
> that the employer generally bears the burden of demonstrating that
> a plaintiff poses a 'direct threat' to herself or others. *Hargrave v.*
> *Vermont*, 340 F.3d 27, 35 (2d Cir. 2003).

*Id.* at *29-31 (internal quotation marks and citations omitted).

In defending against an ADA claim, an employer may assert that an employee "pose[d] a

direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. §12113 (b).

Equal Employment Opportunity Commission ("EEOC") regulations implementing the ADA

define "direct threat" as:

> a significant risk of substantial harm to the health or safety of the
> individual or others that cannot be eliminated or reduced by
> reasonable accommodation. The determination that an
> individual poses a "direct threat" shall be based on an
> individualized assessment of the individual's present ability
> to safely perform the essential functions of the job. This
> assessment shall be based on a reasonable medical judgment
> that relies on the most current medical knowledge and/or on
> the best available objective evidence. In determining whether
> an individual would pose a direct threat, the factors to be
> considered include:
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2 (r). EEOC's Interpretive Guidelines stress that determinations of the

likelihood of harm "'must be based on individualized factual data'" and that "'[g]eneralized fears

about risks from the employment environment, such as exacerbation of the disability caused by

-12-

stress, cannot be used by an employer to disqualify an individual with a disability.'" *Nelson*,

2013 U.S. Dist. LEXIS 117742, at *32-33 (quoting 29 C.F.R. pt. 1630, app. § 1630.2(l)).

As was the case in *Nelson*, this Court "cannot [on the basis of the record before it]

conclude as a matter of law that Plaintiff pose[d] a direct threat to [him]self and others" at the

time of his termination. *Id.* at *31. In a November 30, 2012, letter to Adduci, Yankee Gas took

the position that "[a]s you are aware, you are not able to perform the essential functions of your

present classification of Supervisor-Field Operations." (Doc. 36-5, at 6). Dr. Millette was the

Yankee Gas occupational physician and was, in his own words, "responsible for clearing Mr.

Adduci to return to work." (Doc. # 36-3, at 24). Dr. Millette testified at his deposition that he

didn't believe he was qualified to perform psychiatric fit-for-duty examinations, that he had

arranged psychiatric fitness examinations for other employees, and that he was not aware of any

reason why a psychiatric fitness-for-duty examination was not arranged for Adduci. He testified

further that "[b]ased on Ms. Sweeney's response [to Dr. Millette's October 31, 2012 letter], it

was believed that he wasn't capable of being cleared to do safety sensitive work from his own

health care provider." (Doc. # 42-27, at 9, p. 45:8-11).

The Court cannot conclude as a matter of law that Yankee Gas's determination that

Adduci was not able to perform the essential functions of a Field Supervisor – Operations was

based on "a reasonable medical judgment that relies on the most current medical knowledge

and/or on the best available objective evidence." 29 C.F.R. § 1630.2 (r). It is unclear why a

psychiatric fitness-for-duty examination was not arranged for Adduci and why, instead, Yankee

Gas apparently relied upon APRN Sweeney's statement that, " In regard to Mr. Adduci's ability

to do safety-sensitive type work now or in the future, I do not believe that it is possible to make a prediction about his behavior or abilities." (Doc. # 36-3, at 29). Sweeney testified at her deposition that she did not recall ever making a decision about the potential danger of a patient in his workplace.

With regard to Adduci's relapse after his return to work in July 2012, Sweeney testified it was her understanding that his relapse "was caused by going back to work in July," and she agreed that "he needed additional intensive medical treatment at that time." (Doc. # 36-10, at 12, p. 40:4-9). Adduci's deposition testimony suggests a possible connection between the uncertainty he encountered in his newly assigned position in Waterbury and the deterioration of his mental health in July 2012: "I don't know if it was a relapse or I was just sitting there for four hours a day, just stuff running through your brain, running through your brain, running through your brain. It just drove me crazy because nobody told me what I was doing." (Doc. # 36-8, at 24, p. 88:10-14). To the extent Adduci's July 2012 relapse was a factor in Yankee Gas's determination that Adduci could not perform the essential functions of his job, the Court finds that there is also a genuine dispute as to the actual cause and nature of Adduci's July relapse, i.e., to what extent was the relapse a product of the stress of the position of Field Supervisor – Operations as opposed to a consequence of not being given any information as to why he had been transferred and not being assigned any work in his new location.

"For the reasons explained above, the Court cannot definitively conclude that Plaintiff constituted a 'direct threat' to [him]self or others, as defined by 29 C.F.R. § 1630.2(r). Thus, a genuine dispute of material fact exists as to whether Plaintiff could perform the essential

-14-

functions of [a Field Supervisor – Operations]." *Nelson*, 2013 U.S. Dist. LEXIS 117742, at *43.

For that reason the defendant's motion for summary judgment is denied as to the claim of

adverse employment action due to disability. *See id.* at *21 n.4 ("It . . . makes little sense to apply

the traditional burden-shifting framework to this case. . . . Thus, if Plaintiff demonstrates a

genuine dispute of material fact as to each element of her *prima facie* case, summary judgment

must be denied.").

    B. Failure to Accommodate

    Adduci has also raised a claim that Yankee Gas failed to make a reasonable

accommodation to his known disability in violation of the ADA.  Yankee Gas responds that

Adduci had ninety days to find another position for which he was qualified, but failed to do so.

Adduci replies that Yankee Gas's claim that he "lacked the qualifications for the positions in the

defendant's workforce to which he applied, Stockhandler, and Distribution Mechanic, [is]

completely untrue and based on a misrepresentation of the manner in which the defendant

implements its CDL and medical card requirements." (Doc. #41, at 35).

    "Discrimination in violation of the ADA includes . . . 'not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability.'" *McBride v. BIC Consumer Products Manufacturing Co.*, 583 F.3d 92, 96 (2d

Cir. 2009). A plaintiff asserting an ADA failure to accommodate claim bears the burden of

establishing a prima facie case by showing that: "(1) plaintiff is a person with a disability under

the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3)

with reasonable accommodation, plaintiff could perform the essential functions of the job at

issue; and (4) the employer has refused to make such accommodations." *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006). For purposes of the ADA,  reasonable accommodation may include "'reassignment to a vacant position.'" *McBride*, 583 F.3d at 97 (quoting 42 U.S.C. § 12111 (9) (B)).  "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified." *Id.*

As was the case with Adduci's adverse employment action claim, it is the third prong of the prima facie case that is disputed with regard to the failure to accommodate claim. Yankee Gas gave Adduci ninety days to find a different position within the company prior to termination. During that time period, Adduci applied for four vacant positions at Yankee Gas: Stock Handler, Distribution Mechanic, Test Assistant and Field Technician. Adduci withdrew his application for the Field Technician position and acknowledged that he lacked the required college degree for the Test Assistant position. Yankee Gas argues that Adduci was not qualified for the Stock Handler and Distribution Mechanic positions because those positions required a CDL, which in turn required a medical card, and he did not have a medical card at that time. Adduci testified at his deposition that he had a CDL while he was employed by Yankee Gas, but at some point in time, Yankee Gas "stopped giving us medical cards," which were necessary to maintain a valid CDL. (Doc. # 36-8, at 17, p. 61:17-18). According to Adduci, Yankee Gas stopped giving medical cards to supervisors "because we weren't drivers all the time. We were like incidental drivers they called it." (*Id*. at 17, p. 61:21-23).

With respect to the posted requirement of a CDL for the positions of Stock Handler and Distribution Mechanic, Adduci testified that "[t]hey all in the future would require [a CDL]. If I remember correctly it would be preferred but you didn't need to. You would be able to obtain one." (*Id.* at 38, p. 144:8-10).  He also testified that he would be able to receive a medical card simply by "get[ting] checked by a doctor [to] make sure I am okay to drive." (*Id.* at 17, p. 60:21-22). Adduci argues that "following the defendant's established practice [he] would be issued the medical card on his hiring to go along with his CDL." (Doc. # 41, at 35). Yankee Gas disputes that "it would have required a purely ministerial act" for Adduci to obtain a medical card "in light of his bipolar episodes." (Doc. # 53, at 31). For his part, Adduci argues that "[j]ust as when he returned to work in July of 2012, from his first bipolar disorder related incapacity, he did not have a medical card. However, one was issued to him by the defendant shortly thereafter." (Doc. # 42, at 27, ¶ 39). In support of that contention, Adduci provides evidence that when he returned to his Field Supervisor – Operations position on July 16, 2012, he had not yet been "requalified" for safety sensitive duties, but received medical clearance for safety sensitive duties on July 17, 2012. (Doc. # 42-15, at 2 and Doc. # 42-16, at 2). On the basis of the record evidence, the Court finds that there is a genuine dispute as to whether or not Adduci was qualified for the positions of Stock Handler and Distribution Mechanic. Consequently, Yankee Gas's motion is denied as to the failure to accommodate claim.

Yankee Gas argues that "Adduci was provided an accommodation, the very one Sweeney requested in her letter of November 7, 2012, . . . by being given 90 days to find another position with Northeast Utilities for which he was qualified." (Doc. # 36-1, at 21). Yankee Gas's

November 30, 2012 letter to Adduci, which advised him that he had 90 days to find another position, included the following statement: "You are urged to work with Nancy Monde . . . who will assist you in pursuing any posted job vacancies for which you feel you are qualified. (Doc. # 36-5, at 6). Adduci testified that after he received that letter he contacted Monde and "she said there are no jobs. I said, 'So there are not jobs that I could have at Yankee Gas?' She said, 'You are exactly correct.'" (Doc. # 36-8, at 32, p. 118:5-8).

The Second Circuit has held that "the ADA contemplates that employers will engage in an interactive process with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (internal quotation marks and alterations omitted). "Liability for failure to provide a reasonable accommodation ensues . . . when the employer is responsible for a breakdown in that [interactive] process." *Graham v. Macy's, Inc.*, 14 Civ. 3192 (PAE), 2016 U.S. Dist. LEXIS 10269, at *16-17 (S.D.N.Y. Jan. 28, 2016) (internal quotation marks omitted). Adduci's testimony about his conversation with Monde is evidence that calls into question whether Yankee Gas made a good faith effort to engage in this interactive process with Adduci. Since a reasonable jury could, based on that testimony, find that Yankee Gas had not made a good faith effort to engage in an interactive process with Adduci, that too is a basis for denying the defendant's motion for summary judgment. *See Brady*, 531 F.3d at 136 (In an instance where the defendant employer had failed to engage in the required interactive process, "the district court was correct in declining to grant judgment as a matter of law on the failure to accommodate claim").

-18-

C. After-Acquired Evidence of Wrongdoing

Yankee Gas contends that summary judgment should be granted in its favor as to the remedies of reinstatement and front pay on the basis of after-acquired evidence of wrongdoing by Adduci. In response, Adduci argues that after-acquired evidence is not a relevant consideration for purposes of a summary judgment motion, and that Yankee Gas has not established that Adduci would have been terminated on the basis of the after-acquired evidence.

During the course of discovery in this action certain information came to light regarding Adduci's Yankee Gas employment application. That application included the following statement in the "Applicant's Signature" block: "This application has been completed truthfully and without evasion or omission on my part. . . . I understand that any false statements or omissions are sufficient cause for rejection of this application or dismissal after employment." (Doc. # 36-3, at 7) Adduci's application incorrectly stated that he had been employed by Kentucky Fried Chicken from "1-85" to "12-85." (*Id.*). Adduci failed to disclose in his application that he had been in the United States Navy from February 1985 until October 1985, at which time he had received an "other than honorable" discharge for the stated reason of "misconduct-commission of a serious offense." (*Id.* at 9). At his deposition, Adduci testified that the reason he didn't disclose his service-related information was, "When I was in trouble with all this my lawyer, we had asked him, do we have to say that I was in the service or whatever it is? And he said everything should be dismissed don't admit, you don't have to put that on any of your applications. . . . [T]his was all done in 1985. When we were done with our court and he

had got me out of the service and all of that, that was a question, do I admit? . . . He said, 'You haven't been arrested. You have not been in the service.'" (Doc. # 36-8, at 10, p. 31:9-13, 20-25).

Adduci testified that there were times during the period of his employment by Yankee Gas that he smoked marijuana and synthetic marijuana and took Percocet for pain relief other than as prescribed. He also testified that he did not smoke marijuana while at work and was not under the influence of marijuana while he was at work. The Yankee Gas Drug Policy in effect during Adduci's employment stated that, "The Company will not tolerate any illegal drug use or activity that jeopardizes the health and well being of the employee, other employees, or the public; or undermines government or public confidence in the Company. Yankee Gas is committed to maintaining a workplace free from the influence of drugs." (Doc. # 36-6, at 14). That policy also provided that, "Yankee Gas recognizes that drug abuse is a medical problem that can be successfully treated. Yankee Gas will continue to encourage voluntary drug abuse treatment, but will take appropriate action when an employee's job performance is affected by use of drugs." (*Id.* at 17).

Whether a motion for summary judgment is an appropriate vehicle for a challenge to a particular remedy requested by a party  is somewhat of an unsettled question within the Second Circuit. Some courts have concluded that Rule 56 applies to claims, i.e., "the legal theor[ies] under which relief is sought," but not to the forms of relief sought. *In re Methly Tertiary Butyl Ether Products Liability Litigation*, 517 F. Supp. 2d 662, 664 (S.D.N.Y. 2007) (internal quotation marks omitted). Other courts have "conclude[d] that the word 'claim' in Rule 56 is not limited to the theory of liability that a plaintiff asserts [, . . .  but is] composed of both the theory

of liability and the remedies that that theory supports." *Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 307 (E.D.N.Y. 2010).

Regardless of whether Rule 56 is a proper procedural vehicle for this aspect of Yankee Gas's motion, "summary judgment is inappropriate on an after-acquired evidence defense unless the employer establishes that there are no material issues of relevant fact as to whether the employer would have fired the employee solely on the basis of the newly-discovered evidence." *Sanders v. Madison Square Garden, L.P.*, 06 Civ. 589 (GEL), 2007 U.S. Dist. LEXIS 57319, at *24 (S.D.N.Y. Aug. 6, 2007) (internal quotation marks and alterations omitted). "Even if [the employee] did violate [the employer's] policy, it is [the employer's] burden to show that such wrongdoing would have inevitably led to [the employee's] termination." *Id.* at *32.

The only evidence offered by Yankee Gas in support of its argument that the after-acquired evidence in this case would have resulted in Adduci's termination is the statement by Klimzcak in his affidavit that "[t]hese facts would be sufficient for me to have recommended discharge absent all other issues." (Doc. # 36-6, at 5, ¶ 14). The Court finds that this statement falls short of showing that these facts "would have inevitably led to [Adduci's] termination." *Sanders*, 2007 U.S. Dist. LEXIS 57319, at *32. Additionally, "a fact finder is not required to accept an employer's testimony in determining whether the [after-acquired evidence] doctrine should apply." *Id.* at *33.

There is also evidence in the record, i.e., Adduci's deposition testimony, that Adduci was advised by his attorney that he need not disclose service-related information on job applications, and that he did not smoke marijuana while at work nor work while under the influence of

-21-

marijuana. "In light of the contradictory allegations and claims on both sides, this issue cannot be resolved on a motion for summary judgment." *Id.* at *29 (internal quotation marks omitted). For these reasons, Yankee Gas's motion for summary judgment is denied as to its after-acquired evidence defense.

## IV. <u>CONCLUSION</u>

For the reasons stated above, the defendant Yankee Gas's motion for summary judgment (doc. # 36) is DENIED.

SO ORDERED this   14th   day of   September,  2016.

_____
/s/ DJS

Dominic J. Squatrito

United States District Judge

-22-